IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

ASHLEY Y JACKSON,             )      CASE NO. 1:18CV2362
                             )
          Plaintiff,         )
                             )      JUDGE PAMELA A. BARKER
        v.                  )
                             )      MAGISTRATE JUDGE
                             )      KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL    )
SECURITY ADMINISTRATION,    )
                             )      **REPORT AND RECOMMENDATION**
         Defendant.      )

Plaintiff Ashley Jackson ("Jackson") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

On January 15, 2016, Jackson protectively filed an application for SSI, alleging a disability onset date of March 1, 2008.  Tr. 193.  She alleged disability based on the following: cognitive issues, bipolar, PTSD, anxiety, paranoia, mood swings, anger problems, and depression.  Tr.  214.  After denials by the state agency initially (Tr. 93) and on reconsideration (Tr. 107), Jackson requested an administrative hearing.  Tr. 127.  A hearing was held before an Administrative Law Judge ("ALJ") on January 24, 2018.  Tr. 35-61.  In his March 29, 2018,

1

decision (Tr. 22-30), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Jackson can perform, i.e., she is not disabled.  Tr. 29-30.  Jackson requested review of the ALJ's decision by the Appeals Council (Tr. 190) and, on August 22, 2018, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Jackson was born in 1989 and was 26 years old on the date her application was filed.  Tr. 29.  She attended school through the eleventh grade and has no past relevant work experience.  Tr. 40.

### B. Relevant Medical Evidence

In November 2014, Jackson met with Lisa Lawrence, M.D., at The Centers for Family and Children ("Center"), reporting that she was very depressed, overwhelmed, and very angry lately.  Tr. 836-837.  She could not control her mood swings, would lose her temper, and break things.  Tr. 836.  She did not know where her anger was coming from.  Tr. 836.  She was having anxiety attacks 1-3 times a week.  Tr. 836.  She had seen a cardiologist after multiple emergency room visits for chest pains and was told her heart was okay.  Tr. 836.  She had lost weight, could not sleep, was having nightmares and flashbacks, and racing thoughts.  Tr. 836.  She was living with her fiancé, daughter, sister and mother.  Tr. 836.  She was not taking her Seroquel consistently and "never started Zoloft."  Tr. 836.  Dr. Lawrence assessed her with "bipolar NOS panic disorder with agoraphobia r/o PTSD."  Tr. 837.  She encouraged medication compliance, recommended Jackson consider Depakote, and prescribed Risperdal.  Tr. 837.  In December, Jackson reported doing better; Dr. Lawrence discussed trying to increase her Seroquel for anger

and paranoia and starting Depakote.  Tr. 839-840.

 In March 2015, Jackson returned to Dr. Lawrence; she had stopped taking her medication because she was pregnant.  Tr. 844.  She reported having felt happier on her medication and a lot more calm.  Tr. 844.  She was still breaking things, which calmed her down.  Tr. 844.

On October 26, 2015, Jackson visited the Center for a psychological assessment.  Tr. 305-314.  She complained of depression, mood swings, anger, panic attacks, and paranoia.  Tr. 305.  She reported being happy after the recent birth of her child but a couple of days afterwards feeling sad, down and paranoid.  Tr. 306.  At this visit she was diagnosed with bipolar II, panic disorder with agoraphobia, and PTSD, assigned a GAF of 55,[1] and prescribed a low dose of Zoloft and Risperdal.  Tr. 312-314.

On January 13, 2016, Jackson saw Dr. Lawrence for her anger, depression and anxiety.  Tr. 364.  Jackson reported that things were going "okay" and she looked relaxed and was smiling.  Tr. 364.  She had lost her temper that day and broke a bottle and punched the microwave—her first episode of violence in three months.  Tr. 364.  She still had anxiety and panic attacks but could deal with it better.  Tr. 364.  She was getting angry a lot lately.  Tr. 364.  Her diagnosis remained bipolar II and panic disorder with agoraphobia, and she was assessed with rule out intermittent explosive disorder post-partum.  Tr. 364.  Dr. Lawrence increased her medications.  Tr. 365.

On February 16, 2016, Jackson saw Dr. Lawrence and reported that she took her Zoloft regularly but her Risperdal only three times a week.  Tr. 342.  The Risperdal helps calm her

---

[1] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

down but she doesn't like feeling like she has to take something to be calm.  Tr. 342.  Her two children were doing well and she was happy her life was going better and she was not depressed like she used to be.  Tr. 342.  She was losing her temper, however, and had punched the television when she became angry.  Tr. 342.  She reported having gotten good grades in school and stated that she wanted to go back to school in the fall.  Tr. 342.  She was able to enjoy things but felt like she was being watched all the time.  Tr. 342.  She did not feel mentally able to work and had applied for disability.  Tr. 342.  Dr. Lawrence encouraged her to be compliant with taking her Risperdal.  Tr. 342.

On March 15, 2016, Jackson reported to Dr. Lawrence that she was doing okay, her kids were good, and she was moving into a house.  Tr. 344.  Her temper had been okay, she was not getting much sleep at night, and her mood was irritable and snappy.  Tr. 344.  She had not broken anything lately.  Tr. 344.  She missed her Risperdal once a week.  Tr. 344.  She still had paranoia and felt like she was being watched.  Tr. 344.  She discussed a prank her friend had played on her.  Tr. 344.  Dr. Lawrence increased her medications.  Tr. 344.

On April 12, 2016, Jackson visited the emergency room complaining of chest pain and anxiety.  Tr. 393.  She had not taken her anxiety medication for the last ten days.  Tr. 393.

On May 16, 2016, Jackson saw Dr. Lawrence and reported that she had been in a fight with her brother's fiancée; her brother wanted her to fight his fiancée again but Jackson was staying away from her.  Tr. 862.  She did not feel as safe in her new house, did not like people walking by her house, and was seeing black shadows that run by all the time that she thought were spirits.  Tr. 862.  She felt depressed sometimes and more irritable; she stated that she does not want to take medication her whole life.  Tr. 862.  She was not taking all her Risperdal.  Tr. 862.  Dr. Lawrence increased her Zoloft and Seroquel and added Lamictal.  Tr. 863.

On June 5, 2016, Jackson presented to the emergency room complaining of chest pain and shortness of breath.  Tr. 430.  Upon exam, she was anxious and was treated with Ativan, given IV fluids, and had significant improvement.  Tr. 431. On June 10, 2016, she visited the emergency room complaining of left sided flank pain and stated that she did not like to take medication.  Tr. 476.

On June 30, 2016, Jackson saw Dr. Lawrence; she had been out of her Zoloft and Risperdal for two weeks and her mood was "all over."  Tr. 864.  Her uncle, whom she was close to, had passed away.  Tr. 864.  She was not feeling safe in the new house and there had been a shooting on her street recently.  Tr. 864.  She was hearing things and her paranoia was worse. Tr. 864.  Her anger was bad and she had started cutting herself.  Tr. 864.

On July 15, 2016, Jackson went to the emergency room after having been struck by a motor vehicle while walking across a street.  Tr. 490.  She reported left sided rib pain and back pain.  Tr. 491.

On August 23, 2016, Jackson saw Dr. Lawrence and reported that she was still not feeling safe in her house and was waiting out the six months remaining on her lease and then planned on moving.  Tr. 868.  Her children were doing great.  Tr. 868.  Her anger had been "terrible," although she was not breaking things as much.  Tr. 868.  She was still hearing things in her head.  Tr. 868.  She asked that her medication be increased; Dr. Lawrence increased her Risperdal and restarted her Zoloft and Lamictal.  Tr. 868.

On August 30, 2016, Jackson went to the emergency room complaining of heart palpitations as well as other physical problems, including pain.  Tr. 898.  Her physical and mental exam findings were normal.  Tr. 900.

On September 14, 2016, Jackson went to the emergency room complaining of left-sided

chest pain.  Tr. 541.  She also complained of left sided neck pain and reported straining her neck a few days prior.  Tr. 541.  Upon exam, she was in no distress and had tenderness in her neck and chest.  Tr. 541.  On November 14, she returned to the emergency room for chest pain and shortness of breath that she believed was due to anxiety.  Tr. 585.  She requested, and was given, an albuterol inhaler, stating that she was out of hers at home.  Tr. 585.  She was diagnosed with atypical chest pain.  Tr. 585.  On December 13, she presented again complaining of chest pain and shortness of breath.  Tr. 629.  She requested an albuterol inhaler prescription.  Tr. 630.  She explained that she has had chest pain frequently due to anxiety but that this pain felt different.  Tr. 631.

Jackson had the following emergency room visits in 2017: On January 3, she complained of chest pain and shortness of breath; upon exam, she had right sided chest tenderness and her mental exam findings were normal.  Tr. 654, 656.  On February 9, she complained of chest pain from vomiting after smoking a cigar; upon exam, she had chest tenderness and her mental exam findings were normal.  Tr. 708, 710-711.  On May 9, she complained of left sided chest pain; upon exam, her physical and mental findings were normal.  Tr. 761.  She returned on May 10 reporting chest pain and shortness of breath.  Tr. 780.  Her physical and mental exam findings were normal.  Tr. 782.  On June 1, she went after she had accidentally cut her wrist when throwing a fit and breaking dishes; her mental exam findings were normal.  Tr. 802.

On June 12, 2017, Jackson returned to the Center for a psychological evaluation; she had not been seen there since August 2016.  Tr. 828-832.  She reported feeling anxious, depressed, emotional, overwhelmed and tired.  Tr. 828.  She was not taking any medication and reported that, while on Risperdal, she felt like a zombie.  Tr. 829.  She was prescribed a trial of Lexapro and Latuda.  Tr. 831.

Jackson's emergency room visits resumed: on October 8, 2017, she reported heart palpitations; her physical and mental exam findings were normal.  Tr. 977, 979.  On October 16 she complained of chest pains and reported that she was a hypochondriac; she felt anxious about some upcoming thyroid testing.  Tr. 1008.  Her physical and mental exam findings were normal.  Tr. 1010.  On October 18 she returned because she "began to 'feel weird' after laying down."  Tr. 1025.  She explained that she had 3 shots of alcohol that evening and then, when she went home and tried to go to sleep, she had a racing heart, shortness of breath, her head was "vibrating" and tingling, and she felt anxious.  Tr. 1025.  She thought that the medication she had received at her recent emergency room visit had interacted with the alcohol.  Tr. 1025.  Her physical and mental exam findings were normal.  Tr. 1026-1027.  On October 24 she returned for anxiety, a racing heart and shortness of breath.  Tr. 1041.  Upon exam, she had tachycardia and appeared anxious.  Tr. 1043.  On October 30 she visited for anxiety and her mother's report that she was threatening to harm herself based on a comment she made to a family member.  Tr. 1073.  She denied an intent to harm herself and her mental exam findings were normal.  Tr. 1175.  On November 19 she endorsed having had an allergic reaction to penicillin; her physical and mental exam findings were normal and the doctor diagnosed an anxiety attack.  Tr. 1101.  On November 23 she arrived by ambulance for anxiety but left before she could be assessed.  Tr. 1147.

**C.  School Records**

The Cleveland Municipal School District completed an Evaluation Team Report dated June 6, 2005, when Jackson was 16 years old and in ninth grade.  Tr. 281-289.  She had been receiving special education services since the second grade (1996) for a cognitive disability.  Tr. 282.  Her teacher estimated that she could perform math at a fourth to fifth grade level.  Tr.

283.  In April 1999, she had a full-scale IQ of 64 (deficient), verbal IQ of 62 (deficient), and

performance IQ of 71 (borderline).  Tr. 284.

Jackson had an Individualized Education Program for the tenth grade from May 2007

through May 2008.  Tr. 261-276.  She was to have direct instruction in basic math skills, Tr. 264,

reading comprehension, Tr. 265, and writing skills, Tr. 267, and given the following

accommodations for testing: extra time, being in a small group, and having the directions read to

her as needed.  Tr. 270.

### D.  Medical Opinion Evidence

#### 1. Treating physician

On March 15, 2016, Jackson's treating psychiatrist, Dr. Lawrence, completed a mental

status questionnaire on behalf of Jackson.  Tr. 348-350.  Dr. Lawrence indicated that Jackson had

average intelligence, fair memory, fair concentration, and would have moderate difficulty

adapting to change.  Tr. 348-349.  She would have an easier time with directions and tasks if

they were broken down into small steps.  Tr. 349.  She had a deficiency in social interaction as

she kept to herself and did not like to deal with people and crowds, work pressures would

increase her anger and the likelihood of violence or destruction of property, and adapting to

changes can exacerbate her paranoia.  Tr. 349.

On February 16, 2016, Jackson's counselor at the Center, Stephanie Jordan, completed a

Daily Activities Questionnaire on Jackson's behalf.  Tr. 339-340.  Jordan opined that Jackson

was unable to sustain relationships due to her depression, paranoia, and bipolar.  Tr. 339.  She

had poor stress tolerance and was unable to sustain work relationships.  Tr. 339.

#### 2. Consultative examiner

On March 23, 2016, Jackson saw Nicole Leisgang, Psy.D., for a consultative

psychological examination.  Tr. 352-359.  Dr. Leisgang observed Jackson as being irritable and
she frequently complained during the testing portion of the exam.  Tr. 355.  She was not
confused and had no difficulty detailing her upbringing.  Tr. 355.  During the testing, she
produced six iterations of serial sevens in thirty seconds, but with multiple errors; she was able to
perform serial threes correctly, but it took her 29 seconds.  Tr. 355.  She struggled to mentally
calculate basic word problems.  Tr. 355.  Dr. Leisgang opined that she likely functions in the low
average intelligence range.  Tr. 356.  She had sufficient judgment and adequate insight.  Tr. 356.
IQ testing was administered and her scores ranged from 50 to 69; however, Jackson had refused
to complete parts of the test and Dr. Leisgang stated that the results were therefore "not a valid
reflection of her true abilities."  Tr. 357.  She diagnosed Jackson with unspecified personality
disorder, major depressive disorder recurrent moderate, unspecified anxiety disorder, and
unspecified neurodevelopmental disorder (weaknesses in verbal reasoning).  Tr. 357.  She
concluded that, although Jackson did not put forth her best effort, she did not appear to
exaggerate or minimize her difficulties.  Tr. 357.

### 3. State Agency Reviewing Psychologists

On April 8, 2016, state agency reviewing psychologist Judith Schwartzman, Psy.D.,
reviewed Jackson's record.  Tr. 85-90.  Dr. Schwarzman found that Jackson did not meet a
listing.  Tr. 88.  Regarding her RFC assessment, she opined that Jackson could understand,
remember and perform routine one to three step tasks which do not have fast-paced or strict
production quotas; when symptoms increase, she will occasionally need flexibility in her work
schedule such as taking breaks and pacing; she can interact with coworkers and supervisors
briefly and occasionally in situations requiring no more than superficial contact or resolving
conflicts; she would perform best in a non-public position; supervisors should offer positive

feedback when merited and constructive criticism when necessary; and she can work in an environment where duties are relatively static and major changes are explained in advance and implemented slowly to allow her time to adjust.  Tr. 88-90.  On May 16, 2016, state agency reviewing psychologist Karla Voyten, Ph.D., affirmed Dr. Schwartzman's opinion.  Tr. 102-104.

### E.  Testimonial Evidence

#### 1.  Jackson's Testimony

Jackson was represented by counsel and testified at the administrative hearing.  Tr. 37. She testified that she lives in an apartment with her mother, two children (ages 7 and 2), and their father.  Tr. 38, 42.  She plays with her children sometimes and "somewhat" helps her 7-year-old with schoolwork.  Tr. 42-43.  Her fiancé or mother does most of the cooking.  Tr. 42.  She and her fiancé have been engaged for two years and have been together for eleven.  Tr. 43.  She gets at least four hours of sleep a night.  Tr. 43.  She is able to bathe, dress herself, perform household chores, and goes with her fiancé to pick out food at the grocery store.  Tr. 43.  She likes to be in her room and be by herself; she writes, finding it helps with her thinking or depression.  Tr. 44. She attends church.  Tr. 44.  She has a driver's license and is able to drive.  Tr. 39-40.  Her driver's test was given to her orally.  Tr. 47.  She is able to follow a program on television and she can "somewhat" use a computer; she does not have a computer but goes to the library to use one.  Tr. 41.  She has problems with crowds and described a crowd as more than two people.  Tr. 41.

When she was in school, Jackson started out, and remained, in special education classes; she needed more attention and had a hard time doing math and "no read."  Tr. 45.  When asked about the IQ testing that the consultative examiner (Dr. Leisgang) had done in March 2016, and the examiner's statement that Jackson had not put forth her best effort during the testing, Jackson

explained that she felt like she answered the examiner's questions "to the best knowledge that I can answer." Tr. 46. She had breakdowns with some things Dr. Leisgang was asking her. Tr. 46. A lot of times she gets emotional and she probably put her head down, but the examiner gave her "a second to answer that." Tr. 46. Jackson stated that she answered all the question she was asked but there were a lot of things she didn't understand and she was trying to explain this to Dr. Leisgang, who "probably got a little irritated because I kept asking her can she repeat it...and I know that can get frustrating to someone." Tr. 46. Also, Jackson felt a little embarrassed because she is grown and Dr. Leisgang had to keep explaining things. Tr. 46.

Jackson is on medication for her mental health issues and sees Dr. Lawrence once a month. Tr. 40-41. They talk about her issues and Dr. Lawrence adjusts her medication. Tr. 41. When asked about gaps in treatment periods, for example from August 2016 to June 2017, Jackson answered that during the gaps in treatment she had a mental breakdown. Tr. 52-53. She had no transportation. Tr. 53. She called her case worker and her doctor and they told her to go to a hospital to be seen until she could get transportation. Tr. 53. During the summer her mother wasn't with her and she had no babysitter and no support. Tr. 53. She would go to the hospital to get her medicine if she was going through anxiety. Tr. 53. She goes to the emergency room about three times a month. Tr. 54. Her medication doesn't help with everything; "it can probably numb you up to some things and make you feel a little bit better," but a lot of times her heart and her mind still races. Tr. 54. It was recommended that she get counseling and open up to people, which she recently started doing. Tr. 54. Her medication makes her feel like a zombie. Tr. 55.

When asked why she is unable to work, Jackson answered that her anxiety takes over her and controls her. Tr. 50. Her mind is always racing and thinking about what she's been through

and what happened to her as a kid.  Tr. 51.  If she is by herself, she has flashbacks.  Tr. 51.  No

one understands.  Tr. 51.  She gets angry.  Tr. 51.  She feels like someone is always after her.  Tr.

51.  She can't be around a lot of people.  Tr. 51.  If she tries to talk to someone she is always

having breakdowns and flipping on people.  Tr. 51.  She is tired of flipping on people and

disrespecting them and it's not their fault.  Tr. 51.  When asked if she could perform a job that

permitted her to mostly be by herself, Jackson stated that she could not because she hates feeling

alone.  Tr. 52.  She is scared to be by herself.  Tr. 52.

### 2.  Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing.  Tr. 55-59.  The ALJ asked the

VE to determine whether a hypothetical individual of Jackson's age, education and work

experience could perform work if that person had the limitations assessed in the ALJ's RFC

determination, and the VE answered that such an individual could perform jobs with significant

numbers in the national economy such as kitchen helper, title merchandise marker, and

housekeeping cleaner.  Tr. 74-75.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

In his March 29, 2018, decision, the ALJ made the following findings:

1.   The claimant has not engaged in substantial gainful activity since January 15, 2016, the application date.  Tr. 24.

2.   The claimant has the following severe impairments: bipolar disorder with depression; anxiety disorder with panic; personality disorder; and neurodevelopmental disorder with low average intelligence.  Tr. 24.

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 24.

4.   The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform simple, routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes), involving superficial interpersonal interactions with coworkers and supervisors (no arbitration, negotiation or confrontations), and no interaction with the general public as a job requirement.    Tr. 26-27.

5.   The claimant has no past relevant work.  Tr. 29.

6.   The claimant was born in 1989 and was 26 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  Tr. 29.

7.   The claimant has a limited education and is able to communicate in English.  Tr. 29.

8.   Transferability of job skills is not an issue because the claimant does not have past relevant work.  Tr. 29.

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 29.

10.   The claimant has not been under a disability, as defined in the Social Security Act, since January 15, 2016, the date the current application was filed.  Tr. 30.

## V. Parties' Arguments

Jackson challenges the ALJ's decision on four grounds: (1) the ALJ failed to state valid

reasons for rejecting the opinion of treating source Stephanie Jordan; (2) the ALJ did not

properly evaluate Jackson's psychological impairments at Step Three; (3) the ALJ did not

properly evaluate Jackson's credibility; and (4) the ALJ did not meet his burden at Step Five.

Doc. 13, pp. 11-20.

## VI. Law and Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681

(6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor

resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d

383, 387 (6th Cir. 1984).

### A. The ALJ did not err at Step Three

Jackson argues that the ALJ erred when he considered her psychological impairments at

Step Three.  Doc. 13, p. 14.  She argues that she has "marked" limitations in all four areas of the

paragraph B criteria, rather than "moderate" limitations in these areas as the ALJ found.  Doc.

13, pp. 15-16.

Jackson's arguments regarding the first of the four paragraph B criteria, understanding,

remembering, and applying information, is unpersuasive.  She complains that the ALJ relied on

Dr. Leisgang's finding that she had low average intelligence with poorly developed verbal

reasoning abilities and short-term memory skill deficits, but disregarded Jackson's school

records showing IQ scores in the 62-71 range.  Doc. 13, p. 15.  However, Dr. Leisgang considered Jackson's school records when concluding that Jackson had low average intelligence, as the ALJ observed.  Tr. 25.  Jackson also complains that she struggled to calculate basic word problems and had multiple errors with serial sevens.  Doc. 13, p. 15.  But the ALJ recognized these problems (Tr. 25, 26) yet agreed with Dr. Leisgang that, despite these problems, Jackson was able to follow simple instructions in the care of her home, person, and children.  Tr. 25; see also Tr. 26 (the ALJ noting elsewhere in his decision that Jackson told Dr. Leisgang that she is able to care for her personal needs, prepare meals, perform household chores, drive, and attends GED classes).  As the ALJ commented, a "marked" limitation is one in which the claimant is seriously limited in her ability to function independently and on a sustained basis.  Tr. 26. Independently performing Jackson's daily tasks is consistent with a moderate, rather than marked, limitation.  Finally, the ALJ also relied on the fact that Dr. Lawrence, Jackson's treating physician, opined that Jackson had average intelligence and a fair memory.  Tr. 25.  In short, Jackson disagrees with the ALJ finding that she had moderate, rather than marked, limitations in this area of functioning, but the ALJ's finding is supported by the evidence.

As for interacting with others, the next paragraph B criteria, Jackson alleges that the ALJ's finding that she had a fiancé and attended church was not enough to find a moderate, rather than marked, limitation.  Doc. 13, p. 15.  However, the ALJ also remarked that she got along well with family and that, although she told Dr. Leisgang that she had only one friend, she also mentioned having another friend; i.e., Jackson had friends, a fiancé, got along well with her family, and attended church.  This is evidence that supports the ALJ's finding that she had a moderate, not marked, limitation in this area of functioning.

With respect to concentration, persistence and pace, the third criteria, Jackson alleges that

the ALJ misstated Dr. Leisgang's findings.  The ALJ stated,

> At the consultative exam performed by Dr. Leisgang, the claimant was able to repeat four digits forward and three digits backward.  She performed serial sevens with multiple errors.  However, she was able to perform serial three's correctly although slowly.  She required additional explanation to perform both tasks.  Dr. Leisgang noted that the claimant had no difficulty following the conversation or answering direct questions.  The claimant reported that she has no difficulty completing tasks at her home.

Tr. 26.  Jackson asserts, "Dr. Leisgang actually stated that Plaintiff required additional explanation before attempting the tasks and struggled with easy distractibility."  Doc. 13, pp. 15-16 (citing Tr. 358).  Jackson's assertion that there is a material difference in the ALJ's finding that Jackson "required additional explanation to perform both tasks" and Dr. Leisgang's statement that Jackson "require[d] additional explanation before attempting such tasks" is not persuasive.  Jackson's assertion that Dr. Leisgang stated that Jackson struggles with easy distractibility also fails; Dr. Leisgang wrote that Jackson "*reportedly* struggles with easy distractibility[.]"  Tr. 358 (emphasis added).  In short, Jackson has not shown that the evidence the ALJ relied on in Dr. Leisgang's opinion was inaccurate.

Finally, with respect to adapting or managing oneself, the last criteria, Jackson merely cites record evidence that she breaks things when angry and had multiple emergency room visits for anxiety.  Doc. 13, p. 16.  Nevertheless, the ALJ observed that Jackson is able to care for her personal needs, prepare meals, perform household chores, drive, and take GED classes.  Tr. 26. He also commented that Dr. Lawrence, Jackson's treating physician, opined that Jackson had moderate difficulty adapting to change.  Tr. 26.  This is evidence that supports a finding that Jackson has moderate difficulty in this area.

Jackson argues that the ALJ erred because he did not "address the elements of Listing 12.05" (intellectual disorders).  Doc. 13, p. 16.  She also complains that the ALJ did not discuss her IQ scores from 1999 that were set forth in her school records.  Doc. 13, p. 16.  The fact that

the ALJ did not detail all the elements of Listing 12.05 or her IQ scores was not error because the

ALJ made clear in his decision that Jackson did not meet the requirements of Listing 12.05.  To

meet Listing 12.05, a claimant must show, in addition to relevant IQ scores, "[s]ignificant

deficits in adaptive functioning currently manifested by your dependence upon others for

personal needs (for example, toileting, eating, dressing, or bathing)."  *See* 20 C.F.R. Pt. 404,

Subpt. P, App. 1, § 12.05.  Jackson does not assert that there is any evidence in the record that

she is so limited and the ALJ found that she was not.  The other way a claimant can meet Listing

12.05 is to meet the paragraph B criteria, *id.*, but the ALJ found that Jackson did not meet those

criteria, as set forth above.  In other words, the ALJ was not required to discuss all the elements

of Listing 12.05 or her IQ scores because he found that Jackson did not meet other, required

elements.

In her reply brief, Jackson argues that the ALJ erred when considering the opinions of Dr.

Leisgang and Dr. Lawrence, which he cited in support of his Step Three findings.  Doc. 17, p. 2.

Jackson did not challenge the ALJ's discussion of or use and reliance on these opinion in her

opening brief; this argument, therefore, has been waived.  *See Scottsdale Ins. Co. v. Flowers*, 513

F.3d 546, 553 (6th Cir. 2008) (issues raised for the first time in a reply brief are waived).

In sum, the ALJ did not err at Step Three.

**B. The ALJ did not err when he considered the opinions of Stephanie Jordan and
Dr. Lawrence**

To the extent Jackson argues that the ALJ erred when he did not follow the treating

physician rule when he considered the opinion of her counselor, Stephanie Jordan (Doc. 13, pp.

11-12, 14), such an argument fails because, as a counselor, Jordan is not an acceptable medical

source due deference under the treating physician rule.  *See Walters*, 127 F.3d at 530 (the

treating physician rule only applies to opinions of acceptable medical sources); 20 C.F.R. §

416.902(a) (listing acceptable medical sources); § 416.902(j) listing non-medical sources, including counselors).

The only argument Jackson makes with respect to the ALJ's treatment of Jordan's opinion is to urge that a non-acceptable medical source is "very valuable and should be given weight on key issues" and that it was error for the ALJ to reject Jordan's opinion.  Doc. 13, p. 14. This does not describe an error made by the ALJ.  The ALJ gave Jordan's opinion "partial" weight, observing that it was based on Jackson's self-reports and that Jordan's finding that Jackson could not sustain relationships was inconsistent with the evidence of record.  Tr. 29. Jackson's unarticulated assertion that the ALJ erred when considering Jordan's opinion fails.

In this section challenging the ALJ's treatment of counselor Jordan's opinion (Doc. 13, pp. 1, 11 (stating the issue as being that the ALJ erred when rejecting Jordan's opinion)), Jackson also challenges the ALJ's treatment of Dr. Lawrence's opinion.  Doc. 13, pp. 12-13.  She asserts that the ALJ erred when he gave "great" weight to Dr. Lawrence's opinion but "ignored any observations which contradicted with [the ALJ's] determination that Plaintiff was not disabled" and cites Dr. Lawrence's treatment notes.  Doc. 13, p. 13; Doc. 17, p. 2.  Jackson's challenge to the ALJ's treatment of Dr. Lawrence's opinion is more of a disagreement with Dr. Lawrence's opinion.  As the ALJ observed, Dr. Lawrence assigned Jackson a GAF of 51-60, indicating moderate symptoms (Tr. 27), and opined that Jackson had average intelligence, fair memory and concentration, and moderate difficulty adapting to change (Tr. 28).  The ALJ credited those opinions.  Tr. 28.  It is not entirely clear what Jackson is arguing; she appears to be asserting that the ALJ should have given *less* weight to the opinion of Dr. Lawrence, her treating physician. She complains that Dr. Lawrence's opinion recites Jackson's symptoms and that the ALJ ignored these symptoms.  Doc. 13, pp. 12-13.  But the ALJ did not ignore Jackson's symptoms (Tr. 27),

and Dr. Lawrence, taking into account these symptoms, provided opinions about Jackson's ability to perform work activities, which the ALJ credited and, in large part, adopted.[3]

The ALJ did not err when he considered the opinions of Dr. Lawrence and counselor Jordan.

### C. The ALJ did not err when he considered Jackson's credibility

Jackson argues that the ALJ erred when he considered her credibility.  Doc. 13, p. 17.  To evaluate the credibility of a claimant's symptoms, an ALJ considers the claimant's complaints along with factors such as the objective medical evidence, treating or nontreating source statements, treatment received, and other evidence.  20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304.  The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  *Id*. at *4.  While deference is given to an ALJ's credibility determination, the ALJ's credibility determination will not be upheld if it is unsupported by the record or insufficiently explained.  *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 248-249 (6th Cir. 2007).

Jackson contends, "the ALJ did not properly evaluate the medical evidence and make a defensible determination as to whether Plaintiff's testimony was credible."  Doc. 13, p. 19.  In support, she asserts that she had low IQ scores while in school, anger issues, and "physical problems caused by her anxiety," and that the treatment notes support her contention that the

---

[3]  For example, Jackson states that Dr. Lawrence opined that Jackson could remember, understand and follow directions if they were broken into small steps (Doc. 13, p. 13); the ALJ limited Jackson to performing simple, routine tasks.  Jackson states that Dr. Lawrence found that she kept to herself and did not like to deal with people or crowds; the ALJ limited Jackson to no interaction with the general public and only superficial interaction with coworkers and supervisors.  Jackson states that Dr. Lawrence opined that she would respond to work pressures by increasing her anger and likelihood of violence or destruction of property; the ALJ limited Jackson to performing routine, simple tasks in a low stress environment defined as no fast pace, strict production quotas or frequent duty changes.

ALJ erred.  Doc. 13, p. 19.  As an initial matter, Jackson does not cite to treatment notes of

"physical problems caused by her anxiety"; it is not entirely clear what she is referring to.  The

ALJ recognized that Jackson had numerous emergency room visits due to anxiety attacks that

caused her chest pain, but also accurately stated that her exam findings were normal.[4]  Tr. 27.

The ALJ also accurately explained that Dr. Lawrence had assessed a GAF of 51-60 (indicating

moderate symptoms) and that Jackson was not always compliant with taking her medication,

findings that Jackson does not challenge.  Tr. 27-28.  Finally, the ALJ discussed the fact that her

IQ scores from her consultative exam with Dr. Leisgang were found by Dr. Leisgang to be

invalid, hence the ALJ found them to be invalid.   Dr. Leisgang opined that, based on Jackson's

phraseology, grammatical structure, and vocabulary at the exam *as well as her school records*,

Jackson was functioning in the low average range of intelligence.  Tr. 28.  Jackson's low IQ

scores noted in her school records, therefore, does not compel a conclusion that the ALJ erred

when he considered Jackson's symptoms.

### D. The ALJ did not fail to meet his burden at Step Five

In his decision, the ALJ gave "great" weight to the state agency reviewing psychologists'

opinions that Jackson can perform routine one to three step tasks that do not have fast pace

performance or strict production quota requirements, can interact superficially and occasionally

with coworkers and supervisors, and would perform best in a not-public position—explaining,

"Such is consistent with the overall evidence."  Tr. 28.

Jackson argues that the ALJ erred because he did not include in his RFC a limitation

assessed by the state agency reviewing psychologists that "Supervisors should offer positive

---

[4]  In her reply brief, Jackson argues that the ALJ's finding that she had normal examinations was not supported by Dr. Lawrence's observations.  Doc. 17, p. 4.  The 23 treatment notes Jackson cites, however, are visits with Dr. Lawrence wherein Dr. Lawrence stated what Jackson's reported symptoms were, they do not set forth objective examination findings by Dr. Lawrence.

feedback when merited and constructive criticism when necessary."  Doc. 13, p. 20; Tr. 89, 103.
She points out that, at the hearing, the VE testified that such a limitation would be considered an
accommodation.  Tr. 58-59.  Jackson does not cite legal authority for her assertion that the ALJ
was required to include, verbatim, every limitation set forth in the state agency reviewing
psychologists' opinions in his RFC assessment.

"Even where an ALJ provides 'great weight' to an opinion, there is no requirement that
an ALJ adopt a state agency psychologist's opinion verbatim; nor is the ALJ required to adopt
the state agency psychologist's limitations wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 Fed.
App'x 267, 275 (6th Cir. 2015).  *But see Kreze v. Berryhill*, 2018 WL 3045097, at **7-8
(N.D.Ohio June 7, 2018).  The ALJ gave great weight to the portion of the state agency
reviewing psychologists' opinions described in his decision and he was not required to adopt the
opinions verbatim or wholesale.  Accordingly, the ALJ did not err and his decision should be
affirmed.

## VIII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: September 3, 2019

/s/ Kathleen B. Burke

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).